IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00561-NRN

LEON JOHN KULASA,

Plaintiff,

v.

WYNDHAM VACATION RENTALS NORTH AMERICA, LLC,

Defendant.

---

**ORDER ON
DEFENDANT WYNDHAM VACATION RENTALS NORTH AMERICA, LLC's
MOTION FOR SUMMARY JUDGMENT (Dkt. #70)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter is before me upon the consent of the parties to magistrate judge jurisdiction (Dkt. #23) and the Order of Reference entered by Chief Judge Philip A. Brimmer on May 23, 2019. Dkt. #24. Now before me is Defendant Wyndham Vacation Rentals North America's ("Wyndham" or "Defendant") Motion for Summary Judgment filed May 18, 2020. Dkt. #70. I have carefully considered the motion (Dkt. #70), Plaintiff Leon John Kulasa's Response (Dkt. #77), and the Defendant's reply. *See* Dkt. #82. I also considered additional information submitted by Mr. Kulasa. Dkt. # 89. I heard oral argument from the parties (Dkt. #44) and have taken judicial notice of the file. Now being fully informed and for the reasons discussed below, it is hereby **ORDERED** that the subject motion (Dkt. #70) is **GRANTED** with respect to all claims.

## I. BACKGROUND

Unless otherwise noted, the following facts are based on evidence viewed in the most favorable light to the non-moving party, Mr. Kulasa, who proceeds pro se. Wyndham's motion for summary judgment includes a Statement of Undisputed Facts (hereinafter "DSUF") with references to the record as required by Rule 56. Pursuant to Rule 56(e), where Mr. Kulasa fails to address Wyndham's assertion of fact, I consider the fact undisputed for the purposes of this motion.

In November 2015, Mr. Kulasa began his employment with Wyndham in its Keystone, Colorado location as a Guest Services Agent, a non-exempt, hourly position. DSUF ¶ 1. At the time of hire, Mr. Kulasa completed a "Associate Post Hire Information" survey and selected "No" to the questions of whether he was "Registered Disabled" or in need of accommodations to perform the essential functions of his position. Dkt. #82-4.

In May 2017, Mr. Kulasa accepted a promotion to an exempt-level position as a "P.M. Operations Manager" at a larger Wyndham property in Breckenridge, Colorado. DSUF ¶ 3. Supervised by Linsey Breece and Jesse Schreiner, Mr. Kulasa began training at the property's front desk. Front desk operations, along with maintenance and housekeeping, was one of the essential functions of the position. DSUF ¶ 4. *See also* Dkt #70-12 at 5 ("[W]hile essential job responsibilities are administrative[,] . . . the position will be responsible for the overall operation of housekeeping, maintenance and front desk operation . . .."). Mr. Kulasa was expected to show competence in handling front desk operations before moving on to the other areas of responsibility. DSUF ¶ 4.

Almost immediately, Mr. Kulasa's supervisors identified deficiencies in his ability to complete tasks independently, respond to guest emails, and support front desk staff

2

when needed. DSUF ¶ 5. Ms. Breece offered in-person meetings and training to assist Mr. Kulasa in the months that followed. DSUF ¶ 6. Shortly thereafter, in July 2017, Mr. Kulasa wrote a "letter of concern" to human resources expressing his disgust in how he was being treated by his supervisors. DSUF ¶ 7. He objected to being "tasked to wrap glass vases in paper, and to park a General Mananger[']s company car," and stated that he "refuse[d] to be managed and communicated through emails, gossip, passive aggression, spy pigeons and extreme propaganda." Dkt. #70-18 at 2. The letter does not mention any disability.

Within two days of Mr. Kulasa's letter, Ms. Breece, Mr. Schreiner, and Wyndham General Manager Jesse Larson met with him to discuss his performance issues, as other Wyndham employees had complained to them about Mr. Kulasa's interpersonal skills, attitude, and job performance. DSUF ¶ 8; Dkt. #70-15. During this meeting, Mr. Kulasa claims that he requested to not work the front desk as a "reasonable accommodation" because he did not believe it was part of his job description, that he found the work "boring and stagnate", and "it was having a negative effect on his mental condition." Dkt. #77 at 56–57. Mr. Kulasa does not state that he told Ms. Breece or Mr. Schreiner what specific mental "condition" or "illness" he suffered from, and their notes do not mention any discussion that Mr. Kulasa was disabled. Instead, Ms. Breece left the meeting with the impression that Mr. Kulasa "thinks he is right–and he hears what he wants to hear or what he *thinks* he hears, not always matching what others are actually saying. And when others try to re-clarify he shuts down and doesn't listen at all." Dkt. #70-20 at 1 (emphasis in original).

When Mr. Kulasa, despite consistent coaching, continued to perform poorly, Ms. Breece and Mr. Schreiner issued a final written warning and corrective action notice on July 25, 2017. DSUF ¶ 10. They also had follow-up meetings with him on August 1, 8, and 15, 2017. DSUF ¶ 11. On August 20, 2017, Mr. Kulasa sent an email to both his supervisors claiming that "due to the inappropriate state of my job title . . . I am in an acute state of psychiatric depression," Dkt. #70-22 at 2. However, Mr. Kulasa did not request an accommodation to perform his duties in the front desk.

Then, on September 5, 2017, Mr. Kulasa called an internal Wyndham human resources hotline to complain about his position and stated that he was depressed and suicidal, which prompted Wyndham to request the local police to conduct a welfare check. DSUF ¶¶ 13–14. Mr. Kulasa then took a medical leave of absence under the Family Medical Leave Act (FMLA). DSUF ¶¶ 15. While on leave, Mr. Kulasa communicated via email with Kathleen Ochab, Wyndham's VP of Human Resources, wherein he rehashes his complaints about his job and co-workers. Dkt. #70-25; Dkt. #70-26.

On December 12, 2017, Mr. Kulasa completed neuropsychic testing which indicated that he met the criteria for a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and would benefit from medication to treat the disorder. Dkt. #77 at 107. There is no evidence that he informed Wyndham of this diagnosis or requested an accommodation.

Upon return from leave in January 2018, Mr. Larson sent Mr. Kulasa a memo detailing the expectations of the Operations Manager position, including front desk support duties, PBX desk support, shuttle support, among others. Dkt. #70-27. Mr.

4

Kulasa reported directly to Mr. Larson and focused on the housekeeping and maintenance part of his job. DSUF ¶ 18. Nevertheless, Mr. Kulasa's performance deficiencies continued. DUSF ¶ 19. On February 1, 2018, Mr. Kulasa sent Mr. Larson and Ms. Ochab another "letter of concern," complaining about his treatment by others on the job, but also stating that he understood the front desk duties well and could execute them with both "efficiency and excellence." Dkt. #70-29 at 2. Mr. Kulasa did not claim a disability nor request an accommodation to perform his job in this letter.

Wyndham contends that it terminated Mr. Kulasa in February 2018 after he failed to immediately report damage to a company vehicle; caused complaints for a verbal tirade in which he was observed "cursing incessantly, using the F-word frequently, and complaining the entire time about how much he hates the company and the job he's doing"; refused to cooperate with the Housekeeping Manager; and missed a key meeting. DSUF ¶¶ 22–26.

Mr. Kulasa sued Wyndham under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), and the Colorado Anti–Discrimination Act, Colo. Rev. Stat. § 24–34–401, *et seq.* ("CADA"). He also asserts a state law claim for unpaid wages. Wyndham has moved for summary judgment.

## II. LEGAL STANDARDS

**a. Pro Se Plaintiff**

Mr. Kulasa is proceeding pro se. The Court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007)

(citations omitted). However, a pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). *See also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). A plaintiff's pro se status does not entitle him to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

**b. Summary Judgment**

A motion for summary judgment serves the purpose of testing whether there is a need for trial. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003), *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Pursuant to Rule 56, summary judgment is appropriate when the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's determination depends on whether there are any genuine, factual issues that can be "properly resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing factual basis for its motion. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry it burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). A judge need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

Once the movant properly supports a motion for summary judgment, the non-moving party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Unsupported and/or conclusory allegations do not establish an issue of fact sufficient to defeat summary judgment. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, (10th Cir. 2005). *See also McVay v. Western Plains Service Corp.,* 823 F.2d 1395, 1398 (10th Cir.1987).

## III. ANALYSIS

### a. Mr. Kulasa's ADA and CADA claims

Mr. Kulasa asserts three employment-related claims against Wyndham for discrimination, failure to accommodate, and retaliation, all based on his alleged disability—ADHD. Because these claims rely on circumstantial, rather than direct, evidence, I employ the analytical framework set forth in M*cDonnell–Douglas Corp. v. Green*, 411 U.S. 792, (1973). Under the *McDonnell Douglas* burden-shifting framework, a three-step analysis is conducted: (1) first, "the plaintiff must establish a prima facie case of discrimination or retaliation," (2) if the plaintiff satisfies this initial burden, "the

7

defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action," and (3) the burden then shifts back to the plaintiff who "must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual" *Id.* Because Mr. Kulasa has failed to establish a prima facie case of discrimination or retaliation, I find that his ADA and CADA[1] claims fail.

The ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge or employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a prima facie case for discrimination under the ADA, Mr. Kulasa must show that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1308 (10th Cir. 2017). In order to demonstrate "discrimination," a plaintiff generally must show that he has suffered an "adverse employment action because of the disability." *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001).The ADA defines the terms "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an

---

[1] "The ADA and the CADA are, essentially, parallel statutory schemes that address disability discrimination. . . . Thus, Colorado courts rely upon ADA case law in analyzing CADA claims." *Lee v. Spectranetics Corp.*, No. 12–cv–00633–WYD–MEH, 2013 WL 5416972, at *4 (D. Colo. Sept. 27, 2013).

otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A).

In order to establish a claim under the ADA, a plaintiff must make a prima facie case that he has a disability. Congress defines the term "disability" under the ADA in three ways: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(2). The relevant determination is whether Mr. Kulasa had a disability at the time of the adverse employment decision. *See Carter v. Pathfinder Energy Servs.,* 662 F.3d 1134, 1145 (10th Cir. 2011).

To establish an ADA disability under subsection (A), the disability definition applicable in this case,[2] Mr. Kulasa must "articulate with precision" both his impairment and the major life activity it substantially limited. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (citation omitted). An impairment is substantially limiting when it renders an individual either unable or significantly restricted in her ability to perform a major life activity "compared to the average person in the general population." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).

Mr. Kulasa contends that ADHD is a qualifying disability under the ADA. However, he has presented no evidence from which a rational jury could find that it substantially limited his ability to perform his job as an Operations Manager. Although

---

[2] Mr. Kulasa does not contend that he had a record of an impairment or that Wyndham regarded him as impaired.

he found front desk duty to be dull and beneath his talents, Mr. Kulasa does not articulate, precisely or otherwise, how his ADHD affected his ability to actually perform the work. In fact, Mr. Kulasa maintains in his Response that he "was fully capable of executing the tasks and duties of the front desk, and had been doing so successfully with the Defendants [sic] for 18 months prior to him being promoted to the position of Operations Manager." Dkt. #77 at 8. Significantly, when he was hired, he also explicitly informed Wyndham that was not disabled or in need of accommodations. Dkt. #82-4. And in a November 7, 2017 email, written while Mr. Kulasa was on FMLA leave, he stated that his unspecified "condition did not make my daily work duties unobtainable, my condition was triggered by the poor work culture that was structed by" Ms. Breece, Mr. Larson, and Mr. Schreiner. Dkt. #70-33. Moreover, while he was diagnosed with ADHD in December 2017, that diagnosis contained no functional, employment-related limitations. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) ("A medical diagnosis is insufficient, rather, the ADA requires plaintiffs to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." (internal quotation marks omitted)). Finally, when Mr. Kulasa returned from FMLA leave, he was assigned to housekeeping and maintenance operations, not front desk duty. He does not allege, much less present evidence, that his ADHD impacted his ability perform these tasks. In short, Mr. Kulasa has merely alleged that he suffered from ADHD; he has not shown that it substantially limited a major life activity. Accordingly, he cannot establish a prima facie case of discrimination.

Even if Mr. Kulasa's ADHD qualified as a disability under the ADA, his ADA and CADA claims cannot survive summary judgment because there is no evidence that he

was terminated because of it. In his communications with Wyndham and others, Mr. Kulasa refers to a "mental illness" or "mental condition," but never to ADHD. For instance, in an August 20, 2017 email to Ms. Breece and Mr. Schreiner, Mr. Kulasa states that "[d]ue to the inappropriate state of my job title/position," he was in an "acute state of psychiatric depression." Dkt. #70-22. His failure to reference ADHD makes sense in this context: Mr. Kulasa was not diagnosed with the condition until December of that year. Logically, Wyndham could not have discriminated against Mr. Kulasa for a condition Mr. Kulasa himself did not know about. Even when Mr. Kulasa returned to work in January 2018, after being diagnosed with ADHD, there is no evidence that he informed Wyndham of the condition. On the contrary, the evidence indicates that Mr. Kulasa's employment was terminated because of several incidents that cannot be linked to his ADHD, including damaging a company vehicle and failing to report the accident, and indulging in a profanity-laced tirade against the company in front of other employees. Mr. Kulasa simply has not shown any causal link between an adverse employment action and his disability.

Similarly, Mr. Kulasa cannot show that he requested an accommodation for his disability. "An employer cannot be liable for failing to accommodate a disability if it is unaware of the need for an accommodation." *Aubrey v. Koppes*, --- F.3d ----, 2020 WL 5583649, at *7 (10th Cir. Sept. 18, 2020). Mr. Kulasa never informed Wyndham that he had ADHD or needed some reasonable accommodation to assist him. Thus, Wyndham had no duty to provide such accommodation. Mr. Kulasa argues that he did request a reasonable accommodation in form of not working the front desk. However, he does not state how this request was related to his un-disclosed (and un-diagnosed) ADHD.

11

Furthermore, front desk duties were part of his job, and "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Mason v. Avaya Communs., Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004). Mr. Kulasa also claims that he asked that the front desk be moved and for breaks. Dkt. #77 at 60. However, what he actually requested was to "either eliminate the desk all together [sic] or have the location moved" because in addition for it being in a "difficult area to work in and concentrate[,] . . . there is also a matter of company confidentiality with some information." *Id.* at 168. There is no reference to any disability. Further, Mr. Kulasa conceded in his deposition that he could take a break whenever he wanted. Dkt. #77-3 at 22.

Finally, Mr. Kulasa has not established a prima facie case of retaliation. The ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To prosecute an ADA retaliation claim, "a plaintiff need not show that [ ]he suffers from an actual disability." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001). Rather, on this point, the plaintiff need only show that he had a reasonable, good-faith belief that he was disabled. *Id.*; *see Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA . . .." (quoting 42 U.S.C. § 12203(a))).

To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) he "engaged in a protected activity"; (2) he was "subjected to an adverse employment action subsequent to or contemporaneous with the protected activity"; and (3) there was "a causal connection between the protected activity and the adverse employment action." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186–87 (10th Cir. 2016). A protected activity is opposition to an illegal employment practice that "can range from filing formal charges to complaining informally to supervisors." *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1136 (10th Cir. 2005). The Tenth Circuit has recognized that a request for accommodation can constitute protected activity supporting a retaliation claim. *Foster*, 830 F.3d at 1188. Mr. Kulasa has not identified the protected activity he was engaged in. It was not a request for reasonable accommodation because he never made such a request, and his general complaints about his job and co-workers do not suffice. Although "no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the [ADA]." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Mr. Kulasa has not done so here.

To the extent that Mr. Kulasa's Amended Complaint can be construed to assert a claim for FMLA retaliation, that claim likewise fails.[3] The elements of ADA and FMLA retaliation are the same. *See Salemi v. Colorado Pub. Employees' Ret. Ass'n,* 176 F. Supp. 3d 1132, 1154 (D. Colo. 2016), *aff'd*, 747 F. App'x 675 (10th Cir. 2018). Mr.

---

[3] The Amended Complaint does not explicitly assert a claim for FMLA retaliation. I address the issue in light of Mr. Kulasa's pro se status.

Kulasa alleges in his Amended Complaint that when he returned from FMLA leave, he was demoted from Operations Manager to "Housekeeping Driver" at a lower pay rate. Dkt. #6 at 11. While this may be sufficient to survive a challenge under Rule 12(b)(6), at the summary judgment stage, Mr. Kulasa was required to provide evidentiary support for this claim. Wyndham has produced evidence that Mr. Kulasa was not demoted, but instead told to focus on maintenance and housekeeping, other areas within the Operations Manager's purview. His job title and supervisor remained the same, and his salary even increased. The evidence shows that Mr. Kulasa's termination was also unrelated to his decision to take FMLA leave: as described above, Wyndham set forth several legitimate, business-related reasons why Mr. Kulasa was let go.

### b. Mr. Kulasa's Wage Claim

Mr. Kulasa seeks compensation for unpaid wages under the Colorado Wage Claim Act ("CWCA"). The CWCA provides as follows:

> All wages or compensation . . . earned by any employee in any employment, other than [those due under a deferred compensation plan], shall be due and payable for regular pay periods of no greater duration than one calendar month or thirty days, whichever is longer, and on regular paydays no later than ten days following the close of each pay period unless the employer and the employee shall mutually agree on any other alternative period of wage or salary payments.

Colo. Rev. Stat. § 8-4-103(1)(a). Actions brought under the CWCA must "be commenced within two years after the cause of action accrues" unless the violation is willful, then the limitation period is three years. Colo. Rev. Stat. § 8-4-122.

Mr. Kulasa initiated this lawsuit on February 25, 2019. In his original complaint, he references facts supporting of his ADA discrimination claim, but he did not state a claim for relief for unpaid wages. Mr. Kulasa then amended his complaint on March 11, 2019 and included a separate wage claim. It is undisputed that Mr. Kulasa was

14

promoted to the non-exempt position as Operations Manager on May 26, 2017. Accordingly, the relevant time period for claims relating to unpaid overtime is, at the very earliest, February 25, 2017 through May 26, 2017, at the latest.[4]

Mr. Kulasa's wage claim can be separated into four component parts: (1) over two thousand hours of uncompensated "on-call" time; (2) 180 hours of "contract work" that he performed for Wyndham while he was already on the clock; 3) an unreimbursed cell phone bill; and 4) not being reimbursed for using his personal vehicle for work.

First, Mr. Kulasa claims that Wyndham failed to pay him for 2,160 hours of "on call" pay from April 2016 to May 25, 2017. As noted above, any claim for unpaid wages prior to February 25, 2017 is time-barred. Moreover, Mr. Kulasa has not demonstrated either (1) that he was not paid for hours he recorded in Wyndham's timekeeping system, or (2) that he was somehow prevented from submitting accurate timesheets. Mr. Kulasa's timesheet and paystubs, which were submitted by Wyndham for me to review, indicate that Mr. Kulasa was paid for the overtime and on-call time he worked. *Compare* Dkt. #70-5 *with* Dkt. #70-6. In his Response, Mr. Kulasa argues that Wyndham's employee handbook states that he was entitled to be paid time-and-a-half for all on-call hours worked. *See* Dkt #77 at 29. However, the cited page from the employee handbook actually shows that it is Wyndham's policy that on-call pay is paid at "the associate's regular rate, or at an overtime rate if the associate's on-call work takes him over 40 hours per week." Dkt #77 at 237. Mr. Kulasa's deposition testimony

---

[4] While Mr. Kulasa alleges in his Amended Complaint that Wyndham violated the wage statute willfully with malice or reckless indifference, at the summary judgment stage, he may not merely rest on allegations in his pleadings or arguments in his Response, but must provide some facts showing of the existence of willful intent. There is no evidence in the record any willful violation.

also evidences a confusion over how overtime pay is calculated; he apparently believes that overtime is anything over eight hours in a day (*see* Dkt. #77 at 243), when, under Colorado law, an overtime wage must be paid for all hours worked in excess of 40 hours in one workweek, 12 hours in one workday, or 12 consecutive hours, regardless of whether the work period overlaps into a second day. *See* 7 Colo. Code Regs. § 1103-1:4.[5] Mr. Kulasa provided a spreadsheet, presumably of his creation, of pay dates and pay amounts for hours worked as a Wyndham employee. *See* Dkt. #77 at 246–47. It is unclear how these records were compiled, but they do not overcome the evidence submitted by Wyndham that Mr. Kulasa was responsible for entering accurate timekeeping records and that he was paid for those hours he submitted.

Second, Mr. Kulasa claims that he is entitled to compensation for "contract work" he provided both before and after his promotion to Operations Manager. For example, Mr. Kulasa appears to believe he should have been paid an hourly wage for working the front desk in addition to his compensation as the Operations Manager. He provides no factual support for this contention. He also claims that he essentially labored as a "home contractor, commercial painter, construction roofer, construction seat dock and sea wall builder" prior to his promotion. In addition to the fact that these claims are clearly time-barred, Mr. Kulasa failed to show that he was not paid his hourly wage during this period, and his belief that these duties fell outside the scope of his job description is irrelevant.

---

[5] Under the Fair Labor Standards Act ("FLSA"), overtime must be paid for hours worked in excess of 40 hours in a workweek; the law does not require that overtime be paid for hours worked in excess of 8 hours per day or on weekends or holidays. *See* 29 U.S.C. § 207(a)(1).

16

Finally, Mr. Kulasa claims that he is owed payment for the use of his personal cell phone for company business and mileage reimbursement for his personal vehicle. It is undisputed that Wyndham gave Mr. Kulasa a work phone. Dkt. #70-7. It is also undisputed that Wyndham paid Mr. Kulasa for the mileage reimbursements he submitted to Wyndham. Dkt. #70-8. Mr. Kulasa, on the other hand, provides no documentation regarding the phone expenses he attributes to his employment, or additional mileage reimbursement requests that were not honored. Mr. Kulasa claims that he asked for this information from Wyndham during discovery, but any such documentation, if it exists, would be in the possession of Mr. Kulasa.

Mr. Kulasa has failed present any specific facts showing that there is a genuine issue that Wyndham violated the CWCA. Wyndham is therefore entitled to summary judgment on this claim.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. #70). Judgment shall enter in favor of Defendant Wyndham Vacation Rentals North America and against Plaintiff Leon John Kulasa. Mr. Kulasa's Amended Complaint (Dkt. #6) is **DISMISSED WITH PREJUDICE**.

Date: October 8, 2020

_____
N. Reid Neureiter
United States Magistrate Judge

17